**IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF MISSISSIPPI, SOUTHERN DIVISION**

IN RE:

**BIG LEVEL TRUCKING, INC.**                                    **CASE NO: 25-51204-KMS**

Debtor                                                                          **Chapter 11**

**BANK OF WIGGINS' OBJECTION TO DEBTOR'S FIRST ADDDENDUM TO DISCLOSURE STATEMENT**

Bank of Wiggins (the "Bank"), a creditor and party in interest in the above-styled Chapter 11 case, objects to the approval of the Debtor's First Addendum to Disclosure Statement, dated June 8, 2026 (the "First Addendum to Disclosure Statement")[ECF 525], related to Debtors' Plan of Reorganization dated March 13, 2026 (the "Plan") [ECF 421], and states as follows:

**JURISDICTION AND VENUE**

1.      This Bankruptcy Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (L).

**BACKGROUND**

2.      On August 18, 2025, (the "Petition Date"), Big Level Trucking, Inc (the Debtor" or "BLT") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Mississippi, Southern Division (the "Bankruptcy Court").  No Trustee or unsecured creditors' committee has been appointed, and the Debtor continues

to operate as a debtor-in-possession under 11 U.S.C. §§ 1107 and 1108 of the Bankruptcy Code.

3.  On July 30, 2025, the Debtor was indebted to the Bank in the amount of One Million Five Hundred Twenty-Four Thousand Four Hundred Ninety-Eight and 51/100 Dollars ($1,524,498.51) (the "Indebtedness") and, being so indebted, executed a Promissory Note (the "Note") for account number xxxx5100 in that amount dated July 30, 2025, by which the Debtor promised to repay the Indebtedness to the Bank.

4.  Also on July 30, 2025, and as security for the Note, the Debtor executed a Commercial Security Agreement (the "CSA"), granting the Bank a first-priority security interest in, and lien upon, seventy-seven (77) vehicular units including Dump Trailers, Flatbed Trailers, Curtain Side Trailers, Bulk Trailers, Lowboy Trailers, Van Trailers, Cattle Trailers, Peterbilt Trucks and International Trucks (the "Vehicular Collateral"). The CSA includes an itemized list identifying each unit of the Vehicular Collateral by Year, Make/Model and VIN.  In addition, the Debtor's CSA granted the Bank a security interest in the following:

(A)  All attachments, accessories, replacements of and additions to any of the collateral described herein, whether added now or later;
(B)  All products and produce of any of the property described in this collateral section;
(C)  All accounts, general intangibles, instruments, rents, monies, payments and all other rights arising out of a sale, lease, consignment or other disposition of any of the property described in this collateral section;
(D)  All proceeds (including insurance proceeds) from the sale, destruction, loss or other disposition of any of the property described in this collateral section, and sums due from a third party who has damaged or destroyed the collateral or from that third party's insurer, whether due to judgment, settlement or other process;
(E)  All records and data relating to any of the property described in this collateral section . . . .

The above along with the Vehicular Collateral is collectively the "Collateral".

2

5.      In connection with, and support of, its application for the Loan, the Debtor submitted a July 2025 appraisal of the Collateral reflecting a value of $1,897,500.00.

6.      The Bank perfected its security interest in and lien upon the Collateral by having its interest noted on the Certificates of Title for the Vehicular Collateral.

7.      The Debtor made no pre-petition payments to the Bank on the Note. Less than a month after securing the loan from the Bank, the Debtor filed its Voluntary Chapter 11 petition.

8.      In its **Schedule D: Creditors Who Have Claims Secured by Property** [ECF. 88], the Debtor asserts that the Collateral pledged as security for the Bank's loan has a value of $1,087,500.00 as of the Petition Date. The Debtor's assertion of Collateral value at the time of the Loan compared to the Debtor's assertion of Collateral value nineteen (19) days later at the time of the Petition reflect a decrease in value of $810,000.00.

9.      The Bank is the legal and rightful owner of the Note, the CSA and other applicable loan documents, and the Bank has performed all of its obligations and conditions precedent to enforce the Note, the CSA and other applicable loan documents.

10.      As of the Petition Date, the outstanding balance on the Note was not less than $1,524,498.10 plus interest, attorneys' fees, costs and expenses. (the "Prepetition Indebtedness").

11.      On September 9, 2025 the Bank, as a secured creditor, filed its Proof of Claim in the amount of $1,527,547.51 (Claim No. 8).

12.      The Debtor also held several customer checking accounts with the Bank. At the time of the Petition, and pursuant the Debtor's transactions in the accounts during

the three-month period prior to the Petition Date, the Debtor had overdrafted the accounts in the amount of $1,624,204.97.

13.     On September 9, 2025 the Bank, as an unsecured creditor, filed its Proof of Claim in the amount of $1,624,204.97 (Claim No. 9).

14.     On March 13, 2026, the Debtor filed its initial Disclosure Statement [ECF No. 420] in connection with its proposed Plan. [ECF No. 421].  The Debtor classifies the Bank's secured claim in Class 4, asserting a purported "cram-down" value of $1,086,500, and proposing a Plan treatment of payments for the principal balance of $1,086,500 over sixty (60) months at 4.5% interest.

15.     The Debtor further proposes the unsecured portion of Allowed claims to be included in Class 24 of the General Unsecured Claims.

## OBJECTIONS

16.     11 U.S.C. §1125(b) of the Bankruptcy Code states that "[a]n acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." The term "adequate information" is defined to include information sufficient to allow a quote hypothetical investor of the relevant class to make an informed judgment about the plan."

17.     Moreover, feasibility is an indispensable issue here.  Where the Debtor relies on cash flow projections to establish feasibility, the Disclosure Statement must

disclose assumptions and historical data/comparisons sufficient for creditors to test those projections.

18.    The Disclosure Statement does not provide adequate information regarding the treatment of the Bank's secured and unsecured claims to enable the Bank to make an informed decision about whether to vote for or against the Plan as required by §1125, and lacks sufficient detail regarding valuation of collateral securing Bank of Wiggins' claim.  The Bank and the Debtor have entered into an Adequate Protection agreement, confirmed in the Bankruptcy Court order at ECF 515.  The Addendum includes a line item for the Bank's Adequate Protection, but the Disclosure Statement proposes different treatment for the Bank's secured claim without reconciliation.  As such, the Addendum budget understates, or at least does not adequately disclose, the cash flow required to perform any treatment of the Bank's secured claims.  In addition, the proposed treatment of unsecured creditors, including the Bank which is the largest unsecured creditor, is not adequately explained.

19.    The Debtor's Plan is not feasible on its face.  The Addendum represents that the Exhibit "A" Budget is a more detailed cash flow projection that proceeds, more or less, on a month to month basis for a year.  It is not.  Rather it is a static annualized budget that does not enable an impaired secured creditor to determine whether the Debtor will have cash at the time required to perform.  Timing matters in this case where the Debtor has repeatedly cited to slow seasons, cost fluctuations, driver and payroll inconsistencies, weather and other market conditions that have hindered its cash flow and payment obligations.  The Addendum compounds the problem by stating that the same one-year budget can be rolled over for Plan years two and three.  This approach assumes

away changes in rates, fuel, repairs, insurance, payroll, driver and equipment availability, and other factors – changes in all of which have affected the Debtor before and during the course of this bankruptcy.  The Debtor does not disclose any assumptions supporting a three-year rollover or explain why years 2 and 3 will not differ materially from the first-year projections.

20.     The Addendum Budget is inconsistent with the Debtor's MORs.  The Debtor's MORs reflect actual performance well below the Addendum's revenue projection.  The Addendum assumes revenue well above the recent 7-8 month average without explaining the basis for that increase.  At the same time, the Debtor's actual costs are at or above the Addendum's annualized cost level.  The result is not a modest variance.  As admitted in its own MORs, the Debtor's historic performance is poor and the Debtor has not shown that it can generate the increased revenue assumed by the Addendum.

21.     The Addendum does not explain major changes from the prior budget. The differences occur over a very short, 90-day period, are material, and a creditor cannot evaluate whether the new numbers are accurate, aspirational revisions, or adjustments designed to make the Plan appear feasible.

22.     The Disclosure Statement fails to adequately disclose the details of it's alleged potential avoidance actions and an analysis of the impact on the unsecured creditors.

23.     The Bank reserves its right to raise additional arguments at a Bankruptcy Court scheduled hearing on the Debtor's Disclosure Statement.

**WHEREFORE**, The Bank prays that this Court will enter an Order DENYING approval of the Debtor's Disclosure Statement and granting such other and further relief as deemed just and proper in the circumstances.

Respectfully submitted this 2nd day of July 2026.

BANK OF WIGGINS

By:    */s/ Paul S. Murphy*
          Paul S. Murphy (MB # 101396)

          *ITS COUNSEL*

OF COUNSEL:

BUTLER SNOW LLP
1300 25th Avenue, Suite 204
P.O. Drawer 4248
Gulfport, MS  39502
(T):  (228) 864-1170
(F):  (228) 868-1531
paul.murphy@butlersnow.com

## CERTIFICATE OF SERVICE

I, Paul S. Murphy, do hereby certify that I have this date electronically filed the foregoing document with the Clerk of the United States Bankruptcy Court for the Southern District of Mississippi using the electronic case filing systems ("ECF") of the Court, which ECF system sent a "Notice of Electronic Filing" to all parties and participants who by rule have consented to accept the Notice as service of this document by electronic means, including the following:

Craig M. Geno, Attorney for the Debtor

Christopher J. Steiskal, Sr., Attorney for the Debtor

Abigail M. Marbury, Attorney for the United States Trustee

Office of the United States Trustee for Region 5

DATED this 2nd day of July 2026.

By: _/s/ Paul S. Murphy_
PAUL S. MURPHY

101510573.v1